*No. 05 - 70006*

No. H-02-1865

U.S. COURT OF APPEALS
FILED

MAY   9 2005

CHARLES R. FULBRUGE III
CLERK

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**DERRICK SEAN O'BRIEN,**

**Petitioner-Appellant,**

**V.**

**DOUG DRETKE, DIRECTOR
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,**

**Respondent-Appellee.**

---

On Appeal From the United States District Court
For the Southern District of Texas
Houston Division

---

**APPELLANT'S BRIEF**

---

**THIS IS A DEATH PENALTY CASE**

**Catherine Greene Burnett**
Member, Fifth Circuit Bar
Texas Bar No.  08390900
1303 San Jacinto
Houston, Texas 77002
(713) 646-1831
(713) 646-1744 [fax]
Counsel of Record

*No. 05-70006*

No. H-02-1865

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

DERRICK SEAN O'BRIEN,

Petitioner-Appellant,

V.

DOUG DRETKE, DIRECTOR
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

---

On Appeal From the United States District Court
For the Southern District of Texas
Houston Division

---

APPELLANT'S BRIEF

---

THIS IS A DEATH PENALTY CASE

Catherine Greene Burnett
Member, Fifth Circuit Bar
Texas Bar No.  08390900
1303 San Jacinto
Houston, Texas 77002
(713) 646-1831
(713) 646-1744 [fax]
Counsel of Record

*No. 05-70006*

No. H-02-1865

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

**DERRICK SEAN O'BRIEN,**
**Petitioner-Appellant,**

**V.**

**DOUG DRETKE, DIRECTOR**
**TEXAS DEPARTMENT OF CRIMINAL JUSTICE,**
**INSTITUTIONAL DIVISION,**
**Respondent-Appellee.**

---

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certify that the following listed persons have an interest in the outcome of this case. The representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.   Petitioner-Appellant: Derrick Sean O'Brien, Texas Department of Criminal Justice, Institutional Division, Polunsky Unit, Livingston, Texas.

2.   Respondent-Appellee: Doug Dretke, Director, Texas Department of Criminal Justice, Institutional Division.

3.   Counsel of Record for Petitioner-Appellant:

     a.   Catherine Greene Burnett, 1303 San Jacinto, Houston, Texas, 77002; (713) 646-1831.

4.    Counsel for Respondent-Appellee: Tina J. Dettmar, Assistant
      Attorney General, Capital Litigation Division, P.O. Box 12548,
      Capitol Station, Austin, Texas 78711; (512) 936-1600.

_Catherine Greene Burnett_
**Catherine Greene Burnett**
Member, Fifth Circuit Bar
Texas Bar No. 08390900
1303 San Jacinto
Houston, Texas 77002
(713) 646-1831
(713) 646-1744 [fax]

Counsel of Record

3

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Derrick Sean O'Brien (O'Brien) respectfully requests that this Court set this appeal for oral argument. Oral argument will assist in clarifying why reasonable jurists could debate: whether O'Brien was denied effective assistance when trial counsel failed to present any available, meaningful punishment evidence either from his family or concerning his mental health; whether the jury was improperly restricted in its ability to give effect to mitigation evidence of youth or institutional good behavior not connected to the crime charged; whether O'Brien was harmed by introduction of aggravating punishment evidence of his involvement in a "gang" in violation of his right to freedom of association when the gang was not shown to have engaged in violent criminal activity; and whether O'Brien had a constitutionally protected right to advise the jury of the meaning of a life sentence, i.e. that were he sentenced to life imprisonment, he likely would be ineligible for parole because at the time of trial, Texas was a de facto life without parole state.

Resolution of the ineffective assistance of counsel and mitigation instruction claims involve application of recent United States Supreme Court decisions clarifying clearly established federal law at the time of O'Brien's trial and federal habeas review.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    AEDPA Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      B.    Ineffective Assistance of Counsel Claim . . . . . . . . . . . . . . . . . . . . 7
      C.    Restriction on Jury's Consideration of Mitigation Evidence Claim . . 8
      D.    Consideration of "Gang" Affiliation as Aggravating Punishment
           Evidence Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      E.    Limitations on Parole Law Jury Instruction Claim . . . . . . . . . . . . . . 9

I      O'BRIEN WAS DENIED EFFECTIVE ASSISTANCE BECAUSE TRIAL
       COUNSEL PRESENTED VIRTUALLY NO AVAILABLE, RELEVANT
       MITIGATION EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.    Strickland's Two Part Analysis Applies to Federal Habeas
           Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      B.    Deficient Performance Occurs When Counsel Abandons
           Pre-Trial Investigation of Potential Mitigation Evidence. . . . . . . . . 14
      C.    Trial Counsel Conducted Limited Investigation of Mitigation
           Evidence, Ignored Significant Evidence, and Failed to Present
           a Viable Mitigation Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
           1. Mental Health Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
           2. Testimony from Family Members . . . . . . . . . . . . . . . . . . . . . . . 22
               a. O'Brien's Mother: Ella Jones . . . . . . . . . . . . . . . . . . . . . 23
               b. O'Brien's Grandfather: James Fortson . . . . . . . . . . . . . . 25
               c. Other Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

D.      Prejudice is Established under the Facts of this Case Because
        the Jury was Given no Available Mitigation Evidence of
        Any Weight to Balance Against the Strong Future
        Dangerousness Evidence Provided by the State. ............... 29
        1. State's Aggravation Evidence ........................... 30
        2. Available Mitigation Evidence ......................... 32

II      O'BRIEN WAS DEPRIVED OF A JURY DETERMINATION OF
        PUNISHMENT THAT DID NOT REQUIRE A NEXUS BETWEEN
        MITIGATION AND THE CHARGED OFFENSE. .................. 37

A.      Throughout Trial the Prosecution Sought to Restrict
        Consideration of Mitigation Evidence, By Stressing that
        It Must Be Connected to the Crime. ........................ 38
        1.      Voir Dire Examination ............................. 38
        2.      Direct Examination at Punishment     ................. 40
        3.      Final Argument .................................... 40
B.      Age and Institutional Good Behavior Were Mitigating
        Evidence Presented at Punishment and Not Connected
        to the Offense. .......................................... 41

III.    O'BRIEN WAS HARMED BY INTRODUCTION OF EVIDENCE OF GANG
        MEMBERSHIP AS AN AGGRAVATING PUNISHMENT FACTOR. . . 43

IV.     O'BRIEN WAS CONSTITUTIONALLY ENTITLED TO INFORM THE
        JURY OF THE ACTUAL MEANING OF A LIFE SENTENCE. ....... 47

A.      Simmons Applies to Texas Death Penalty Practice and Under the Facts
        of O'Brien's Case. ........................................ 49
B.      Teague Does Not Bar Application of Simmons in this Case. ...... 52

CONCLUSION ............................................... 53

CERTIFICATE OF SERVICE ...................................... 54

CERTIFICATE OF COMPLIANCE ................................... 55

# TABLE OF AUTHORITIES

## FEDERAL CASES

Aptheker v. Secretary of State, 378 U.S. 500 (1964) . . . . . . . . . . . . . . . . . . . . . . 45

Barclay v. Florida, 463 U.S. 939 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Baxter v. Thomas, 45 F. 2d 1501 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . 28

Beck v. Alabama, 447 U.S. 625, 637 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Bouchillon v. Collins, 907 F. 2d 589 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . 26, 29

Bullington v. Missouri, 451 U.S. 430 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Burger v. Kemp, 483 U.S. 776 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Dawson v. Delaware, 503 U.S. 159 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 45

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . 36, 37, 42, 43

Elizalde v. Dretke, 362 F.3d 323 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 50

Franklin v. Lynaugh, 487 U.S. 164 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 43

Fuller v. Johnson, 114 F.3d 491 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 46

Gardner v. Johnson, 247 F.3d 551 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 6

Harris v. Reed, 894 F. 2d 871 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Jones v. Dretke, 375 F.3d 352 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 9, 50

Kelly v. South Carolina, 534 U.S. 246 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Kimmelmann v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 28

Kubat v. Thieret, 867 F. 2d 351 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 16

Lockett v. Ohio, 438 U.S. 586 (1977) . . . . . . . . . . . . . . . . . . . . . . . . 15, 36, 37, 42

Lockhart v. Fretwell, 506 U.S. 364 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 13, 36

McDougall v. Dixon, 921 F. 2d 518 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 28

Mitchell v. Kemp, 762 F.2d 886 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 25

NAACP  v. Alabama ex. Rel. Patterson, 357 U.S. 449 (1958) . . . . . . . . . . . . . . 45

Penry v. Johnson, 532 U.S. 782 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 52

Profitt v. Waldren, 831 F. 2d 1245 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 28

Ramdass v. Angelone, 530 U.S. 156 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Ransom v. Johnson, 126 F.3d 716 (5th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . 13

Rector v. Johnson, 120 F.2d 551 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 30

Roper v. Simmons, 125 S.Ct. 1183 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Simmons v. South Carolina, 512 U.S. 154 (1994) . . . . . . . . . . . . . . . . . . . . . 9, 49

Skipper v. South Carolina, 476 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . . . 36, 37, 42

Soffar v. Johnson, 237 F.3d 411 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 7-9

Strickland  v. Washington, 466 U.S. 668 (1984)  . . . 7, 8, 12, 13, 14, 25, 26, 30,38

Tennard v. Dretke, 124 S.Ct. 2562 (2004) . . . . . . . . . . . . . . . . . . . . . . . . 8, 38, 43

iv

Thomas v. Kemp, 796 F. 2d 1322 (11th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Cronic, 839 F. 2d 1401 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . 28

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . 6, 7, 10, 12, 13, 16, 17, 20, 21, 31, 32, 37, 53

Wilkerson v. Collins, 950 F.2d 1054 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 30

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . 6, 7, 11, 12, 43, 53

Wilson v. Butler, 813 F.2d 664 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 26

## UNITED STATES CONSTITUTION

FIRST AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 44, 45, 46, 47

SIXTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8, 9, 12, 13, 36

EIGHTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 42

## FEDERAL STATUTES

28 U.S.C. § 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii, 42

28 U.S.C. § 2253(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 49

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

28 U.S.C. §§ 2254(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## STATE CASES

O'Brien v. Texas, 519 U.S. 1094 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Ex Parte O'Brien, (Tex. Crim App. No. 511264-01, February 6, 2002 . . . . . . . . . x

**STATE STATUTES**

Tex. Penal Code § 19.03(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Tex. Code Crim. Proc. art. 11.071 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 45

Tex. Code Crim. Proc. art. 37.071 §1,§2(g) . . . . . . . . . . . . . . . . . . . . . . 14, 26, 29

Tex. Code Crim. Proc. art. 37.071§§2(b), 2(e) . . . . . . . . . . . . . . . . . . . . . . . . . 30

Tex. Code Crim. Proc., art. 37.071 §2(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Tex. Code Crim. Proc. art. 42.18 §8(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**FEDERAL RULES**

5th Cir. R. 32.2.7(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 42, 43

5th Cir. R. 32.2.7(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**OTHER AUTHORITIES**

ABA <u>Standards for Criminal Justice</u> 4-1.1 to 4-8.6 ( 2d ed. 1980) ("The Defense
Function"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

H. Mitchell Caldwell and Daryl Fisher-Ogden, *Stalking the Jets and the Sharks:
Exploring the Constitutionality of the Gang Death Penalty Enhancer*, 12 Geo.
Mason L. Rev. 601, 622 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Janet Morrow and Robert Morrow, *In a Narrow Grave: Texas Punishment Law in
Capital Murder Cases*, 43 S. Tex. L. Rev. 979 (2002) . . . . . . . . . . . . . . . . . 20, 51

Texas Senate Bill 60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## JURISDICTIONAL STATEMENT

This United States Court of Appeals for the Fifth Circuit has jurisdiction to consider this appeal pursuant to 28 U.S.C. § 2253(c)(1). The federal district court had jurisdiction to consider the underlying petition for writ of habeas corpus from a prisoner under sentence of death pursuant to 28 U.S.C. § 2254, *et seq.*

This appeal is from a final order of the federal district court, dated January 13, 2005, dismissing Petitioner-Appellant's petition for writ of habeas corpus without a hearing. The federal district court also denied Petitioner-Appellant a Certificate of Appealability. Petitioner-Appellant filed Notice of Appeal on February 14, 2005. An Application for a Certificate of Appealability is being timely filed contemporaneously with Appellant's Brief on or before May 6, 2005.

## ISSUES PRESENTED FOR REVIEW

The following issues are presented for review in regard to the Application for

a Certificate of Appealability filed contemporaneously with Appellant's Brief:

1.    Whether reasonable jurists would find it debatable that O'Brien received effective assistance when trial counsel presented virtually no available, relevant mitigation evidence either from his family or concerning his mental health.

2.    Whether reasonable jurists would find it debatable that O'Brien was deprived of jury consideration of mitigation punishment evidence of youth and institutional good behavior because it was not "linked" to the charged offense.

3.    Whether reasonable jurists would find it debatable that O'Brien was harmed by introduction of evidence on the question of future dangerousness of his "gang" membership when the gang was not shown to have engaged in violent criminal activity.

4.    Whether reasonable jurists would find it debatable that O'Brien was constitutionally entitled to inform the jury of the actual meaning of a life sentence, i.e., that were he sentenced to life imprisonment, he likely would be ineligible for parole.

## STATEMENT OF THE CASE

Petitioner-Appellant O'Brien is a death-sentenced prisoner who seeks reversal of the federal district court's failure to grant relief through the application of prevailing constitutional law.

The 184th Criminal District Court of Harris County, Texas, entered the judgment under attack. O'Brien was arrested on June 29, 1993, charged with capital murder on the same date, indicted by a Harris County grand jury on August 30, 1993, re-indicted on September 23, 1993, and re-indicted again on February 4, 1994, in cause number 9402971. O'Brien was represented at trial by two court appointed lawyers.

O'Brien entered a plea of not guilty. His jury trial began April 5, 1994 and the jury returned a verdict of guilty on April 7, 1994. O'Brien did not testify at trial.

Sentencing proceedings were conducted on April 9, 1994. The jury returned affirmative answers to the first two special issues, and answered the mitigation special issue in the negative. As required by the verdict, the trial court sentenced O'Brien to death on that same date.

O'Brien filed a notice of appeal on May 9, 1994. He was represented by new court appointed counsel who challenged the validity of the conviction in a brief raising 32 points of error. The Texas Court of Criminal Appeals affirmed the

conviction and sentence in an unpublished opinion. *O'Brien v. State* (Tex. Crim. App. No. 71,859; delivered May 15, 1996).

O'Brien pursued a petition for writ of certiorari in the Supreme Court of the United States of America which was denied. *O'Brien v. Texas,* 519 U.S. 1094 (1997). Accordingly, the mandate issued July 5, 1996.

Pursuant to state statute, new post-conviction writ counsel was appointed. Tex. Code Crim. Proc., articles 11.071 and 28.054. A State Application for Writ of Habeas Corpus was timely filed in December, 1997, raising fourteen points of error, and a supplemental [fifteenth] ground for relief was filed on August 23, 2001, while the writ was still pending in the state convicting court.

No state court evidentiary hearing was held, despite the fact that the judge presiding over the state writ application had not been the trial judge. On November 13, 2001, the trial court adopted the State's proposed findings of fact and conclusions of law, and recommended that the writ be denied. The Texas Court of Criminal Appeals denied state habeas relief on February 6, 2002. *Ex parte O'Brien,* (Tex. Crim. App. No. 51,264-01, February 6, 2002; not designated for publication).

Undersigned counsel, together with lead counsel John Perry, was appointed to represent O'Brien in this proceeding on May 1, 2002. A preliminary petition was timely filed on May 16, 2002. O'Brien's Supplemental and/or Amended Petition was

timely filed on October 1, 2002. Respondent's Answer and Motion for Summary Judgment were filed more than a year and a half later, on May 28, 2004.

The Hon. Kenneth Hoyt, Judge of the United States District Court, dismissed the petition without a hearing on January 14, 2005. Judge Hoyt also declined to issue a certificate of appealability.

Notice of Appeal was filed on February 14, 2005. This brief is being timely filed contemporaneously with O'Brien's Application for a Certificate of Appealability on or before May 6, 2005.

No. H-02-1865

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

DERRICK SEAN O'BRIEN,
Petitioner-Appellant,

V.

DOUG DRETKE, DIRECTOR
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,
Respondent-Appellee.

_____

On Appeal From the United States District Court
For the Southern District of Texas
Houston Division

_____

APPELLANT'S BRIEF

_____

Appellant Derrick Sean O'Brien (O'Brien), believing that he has made an

adequate showing of denial of substantial constitutional rights in his state capital

murder conviction, asks this Court to reverse the judgment of the federal district court

denying writ relief. This Court has jurisdiction under 28 U.S.C. § 2253.

**STATEMENT OF FACTS**

Derrick Sean O'Brien was convicted of capital murder and given the death penalty in one of the most publicized crimes and series of trials in contemporary Houston memory.[1]  Two young high school aged girls were abducted by five to eight young men as they walked home, brutally raped, and murdered.  From the first day, the motive for the crime was attributed to gang initiation rituals.  The cases entered popular consciousness either by reference to the victims (the "Pena-Ertman murders") or by reference to the leader of "gang" (the "Peter Cantu gang murders").

At the time of the murder, O'Brien was an 18-year old African-American with a troubled family history and record of bad behavior at school.  For several years his primary identity and support came from his association with Peter Cantu and the other co-defendants.  The crime appeared to be one of opportunity rather than plan or design in that Cantu, O'Brien and their friends were partying down by the railroad tracks and testing the mettle of a recent addition to the group when the two girls happened by on their way home.  Both victims were known to Peter Cantu and his confederates and

---

[1] Almost a dozen years after the crime, it still receives major press coverage. See, e.g., articles in *Houston Chronicle* during March 2005, http:// www.chron.com/cs/CDA/ssistory.mpl/ editorial/3063746 [Editorial: "Among those inmates receiving permanent reprieves are two men slated to die in June for the brutal gang initiation killings of 16-year-old Elizabeth Peña and Jennifer Ertman in 1993 . . . (discussion of facts)"]; http://www.chron.com/cs/CDA/ssistory.mpl/ metropolitan/3064035 (interviews with victim's family following United States Supreme Court's decision banning juvenile execution); http://www.chron.com/cs/CDA/ssistory.mpl/metropolitan/ 3063863 (interview with victim's family).

2

the two groups had seen one another earlier that evening at an apartment pool party. Trial testimony was contradictory about whether O'Brien actually raped the victims or caused their deaths although it was clear that his belt was used to subdue the victims. Following the sexual assault and murder, the entire troop of young men except O'Brien went to the home of Peter Cantu's older brother to continue the party and brag about their prowess. In contrast, O'Brien returned to his mother's apartment, and starting that night, began expressing remorse for the deaths. Following his arrest O'Brien gave two inculpatory statements to the police, one of which lead to recovery of his belt.

The government's punishment evidence focused on O'Brien's violent school behavior beginning in the fifth grade, his subsequent problems at alternative school, and his history of car thefts and shoplifting. The most damaging evidence, attributable to Peter Cantu, was that O'Brien admitted killing another girl following an unsuccessful attempt to rape her in a public park. No defense evidence was introduced at punishment other than that there had been no disciplinary actions taken against O'Brien while he was in custody in the Harris County Jail.

O'Brien was convicted of capital murder in April of 1994. Tex. Penal Code § 19.03(a)(2). Pursuant to the jury's answers to the three statutory special issues, the trial judge sentenced Petitioner to death. Tex. Code Crim. Proc. art. 37.071§§2(b),

2(e), and 2(g).

O'Brien seeks appellate review on four grounds. First, because he was denied effective assistance when trial counsel failed to present available, meaningful mitigation evidence at the punishment phase. Second, because the jury at the punishment phase of his capital murder prosecution was deprived of the ability to give meaningful consideration to his youth, after having been "qualified" during voir dire on the principle that mitigation evidence must be tried to the crime charged. Third, because his First Amendment voluntary right of association was improperly made the subject of the prosecution's punishment case. Fourth because he was denied the right at sentencing to advise the jury that, were he sentenced to life imprisonment, he likely would be ineligible for parole.

## SUMMARY OF ARGUMENT

O'Brien's Sixth Amendment right to counsel was not met because court-appointed trial counsel failed to present available, relevant mitigation evidence at punishment. The trial record introduced by the State at punishment is replete with red flags indicating serious mental health problems and childhood abuse. Trial counsel did little to pursue those leads. Having prematurely terminated pre-trial punishment investigation, counsel was forced to rely solely on testimony from a records custodian who had never met the 18-year old defendant for evidence of O'Brien's good conduct while incarcerated. Additionally, counsel failed to call available family members as punishment witnesses although they could have testified both to O'Brien's life history and to mental health issues.

O'Brien's death sentence was imposed by a jury that had been wrongly qualified on the theory that mitigation evidence must be connected to the offense in order to be relevant. Starting with voir dire and continuing through trial and final argument, jurors were told that purported mitigation evidence was not actually mitigation evidence that could be considered in a Texas capital murder prosecution unless it was "linked" to the murder itself. Thus the jury was deprived of a vehicle to give effect to either O'Brien's youth or his institutional good behavior.

5

O'Brien's death sentence was imposed by a jury that was unconstitutionally invited to consider as aggravating evidence, pertaining the question of his future dangerousness, membership in a gang when there was no evidence that the gang was involved in any violent criminal activity.

O'Brien's constitutionally protected right to advise the jury of the meaning of a life sentence was abridged. Texas is a de facto life without parole state, a fact acknowledged by prison officials and currently being enacted into statute by the Texas Legislature.

## STANDARD OF REVIEW

### A.    AEDPA Review

Under AEDPA jurisprudence, a state court decision is "contrary to ... clearly established Federal law, as determined by the Supreme Court" under either of two possible scenarios. 28 U.S.C. §§ 2254(d)(2). First, the state court applies a rule contradicting the governing law set forth in Supreme Court cases. This inquiry is limited to an analysis of the law as it was "clearly established" by Supreme Court precedent at the time of the state court's decision. *Wiggins v. Smith*, 539 U.S. 510 (2003). Second, the state court confronts facts materially indistinguishable from controlling Supreme Court precedent yet arrives at a different result. *Gardner v. Johnson*, 247 F.3d 551, 557 (5th Cir. 2001)(quoting *Williams v. Taylor*, 529 U.S. 362,

413, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).

A state court decision is an "unreasonable application of clearly established" Supreme Court precedent when, although it correctly identifies the governing legal rule, it applies that rule unreasonably to the facts of a particular case. *Wiggins,* 539 U.S. at 520; *Williams,* 529 U.S. at 407-408.   In other words, the court's decision represents an unreasonable application of federal law if the state court identifies the correct governing legal principle but then unreasonably applies that principle to the facts of the prisoner's case.

There is a presumption that a state court's factual findings are correct and appellate courts defer to them "unless they were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Williams*, 529 U.S. at 409-410 (internal quotation and citation omitted). The "unreasonableness" inquiry is objective. *Id.*

This Court should review the district court's findings of fact for clear error and issues of law *de novo*. *Soffar v. Johnson*, 237 F.3d 411, 445 (5th Cir. 2000).

**B.    Ineffective Assistance of Counsel Claim**

For the purpose of federal habeas review under §2254(d), the established standard governing ineffective assistance claims is *Strickland v. Washington*, 466 U.S. 668(1984); *Williams v Taylor*, 529 U.S. 362 (2000).

7

To establish a Sixth Amendment violation of ineffective assistance under the two prong test of *Strickland,* a defendant must make two showings. First, counsel's performance was deficient - that the representation fell below an objective standard of reasonableness and not the result of reasonable trial strategy. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687. Both components of an ineffective assistance assertion [performance and prejudice] are mixed questions of law and fact. *Id.* at 698.

## C.   Restriction on Jury's Consideration of Mitigation Evidence Claim

For the purpose of federal habeas review, the established standard governing limitations on a Texas capital jury's consideration of mitigating evidence is *Tennard v. Dretke*, 124 S.Ct. 2562 (2004), holding that impaired intellectual functioning is inherently mitigation-relevant regardless of a nexus between that mental state and the crime. *Tennard* reaffirms that a state may not bar consideration of evidence that might serve as a basis for a sentence of less than death. Review of this claim presents only legal issues, thus is *de novo*. *Soffar v. Johnson*, 237 F. 3d 411 (5th Cir. 2000).

**D.    Consideration of "Gang" Affiliation as Aggravating Punishment Evidence Claim**

For the purpose of this appeal from a denial of federal habeas relief in a state death penalty conviction, the established standard governing the appropriate role of freedom of association decisions as aggravating punishment evidence is *Dawson v. Delaware*, 503 U.S. 159 (1992). The claim presents only issues of law; the standard of review is *de novo*. *Soffar v. Johnson*, 237 F.3d 411 (5th Cir. 2000).

**E.    Limitations on Parole Law Jury Instruction Claim**

The established standard governing parole law instructions is *Jones v. Dretke*, 375 F.3d 352 (5th Cir. 2004), applying *Simmons v. South Carolina*, 512 U.S. 154 (1994) to Texas death penalty prosecutions.

**I.    O'BRIEN WAS DENIED EFFECTIVE ASSISTANCE BECAUSE TRIAL COUNSEL PRESENTED VIRTUALLY NO AVAILABLE, RELEVANT MITIGATION EVIDENCE.**

The State of Texas violated O'Brien's Sixth Amendment constitutional right to the effective assistance of counsel when court-appointed trial counsel failed to adduce any but the most perfunctory mitigation evidence. Counsels' decision to present only one punishment witness (a records custodian)was based in part on incomplete and prematurely terminated investigation of mental health issues, in part on limited investigation of family members other than their client's mother, and in part on faulty conclusions about the significance of evidence that the limited

9

investigation revealed. The district court, while identifying the correct legal standard, misapplied that standard to the facts of the case. Specifically, the district court's reliance on trial counsels' claims of strategy ignores both the deficiencies of counsels' investigation and logical fallacies of the decisions they reached.

O'Brien was provided with virtually no defense to the state's demand that his life be taken. Despite his youth, his troubled family history, and other serious mitigating evidence relating to a long history of mental health problems, O'Brien's attorney produced only a single witness at punishment: a deputy sheriff records keeper, who was not even asked if he knew O'Brien. Instead he testified that, according to his records, while in jail, O'Brien had no disciplinary problems. His defense counsel then rested O'Brien's case without introducing any exhibits or testimony of any kind to counter the state's dehumanizing portrayal of O'Brien.

The jury's decision not to spare the 18-year old O'Brien's life was not the result of weighing aggravating and mitigating evidence as is contemplated by the capital murder statute. The answers given by the jury to the special issues were not hammered out on the crucible of truth-seeking advocacy. Instead, the jury's decisions in respect to the special issues were made void of any real evidence that O'Brien's life should be saved. O'Brien is entitled to relief under *Wiggins v. Smith*, 539 U.S. 510 (2003). The record amply demonstrates that trial counsels' failure to pursue obvious

leads and to investigate thoroughly resulted from inattention or a failure to comprehend the magnitude of the evidence confronting them.

Counsel's performance was deficient because compelling issues raised in the last minute psychological reports were of the scope and magnitude that would alert reasonably competent counsel to the need for further investigation. These reports suggest a long history of abuse and attendant psychological problems. They help explain how and why the young O'Brien became involved with the "Peter Cantu Gang" as well as his position as a group follower, both of which were critical concepts under the facts of the case. In short, they help provide insight into a shocking, horrific and seemingly inexplicable crime and O'Brien's relative moral culpability for those tragic events.

Counsels' claimed "strategy" that introducing such evidence would harm O'Brien is illogical for two reasons. First, without further pursuing the mental health issues raised in prelminiary reports, counsel could not know what other mitigation eivdence might be discovered and what light that evidence would shed on evidence already known. As the Supreme Court has repeatedly reaffirmed, counsel's decision not to introduce mitigating evidence must be based on an investigation that is *itself* reasonable. *Wiggins,* 529 U.S. at 523.

Second, even if no further investigation had been conducted, counsels' decision

11

to present virtually no mitigation evidence was not a sound one based on the reasons advanced by trial counsel during state habeas proceedings: primarily, that this would allow the prosecution to introduce counterbalancing "aggravation" evidence. In fact, the punishment evidence presented by the State was intense and thorough, spanning acts of misconduct and aggression from O'Brien's elementary school days until the time of the offense.

A.    **Strickland's Two Part Analysis Applies to Federal Habeas Review.**

The constitutional standard for judging the effectiveness of counsel under the sixth amendment is a two-prong test, requiring that the petitioner show: (i) counsel's performance was so "deficient," that is, that counsel did not provide "reasonably effective assistance," and (ii) that counsel's errors "prejudiced the defense by depriving the defendant of a fair trial whose result reliable." An attorney is ineffective if he or she "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984)[2]. "Prejudice" is established if, but for counsel's errors, there is a reasonable probability" that the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

---

[2] The standard governing claims of ineffective assistance of counsel established in *Strickland v. Washington*, 466 U.S. 668 (1984), "qualifies as 'clearly established' federal law as determined by the Supreme Court of the United States" for the purpose of federal habeas review under §2254(d). *Williams*, 529 U.S. at 391; *Wiggins v. Smith*, 539 U.S. 510 (2003).

Under *Strickland,* Petitioner must show that counsel's performance was deficient, by showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense, showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable. *Strickland,* 466 U.S. at 687. As this Court has observed, to satisfy the burden of this prong, a defendant must demonstrate that the prejudice rendered sentencing "fundamentally unfair or unreliable." *Ransom v. Johnson,* 126 F.3d 716, 721 (5th Cir.), cert. denied, 522 U.S. 944 (1997), quoting *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 843 (1993). In assessing prejudice when the claimed deficiency is a failure to properly investigate and present mitigating evidence, the reviewing court reweighs evidence in aggravation against the totality of available mitigation evidence. *Wiggins*, 539 U.S. at 534.

In each case, the challenging defendant must tie *Strickland's* deficiency and prejudice prongs to particular instances of counsel performance, and identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment, and to have rendered the result of the trial unreliable. *Strickland,* 466 U.S. at 690.

**B.    Deficient Performance Occurs When Counsel Abandons Pre-Trial Investigation of Potential Mitigation Evidence**.

Counsel owes the accused a duty of competent representation.    This is particularly true in a capital case, because "there is a significant difference between the death penalty and the lesser punishments." *Beck v. Alabama*, 447 U.S. 625, 637 (1980).  Although the effectiveness of counsel must be determined on a case-by-case basis, *Strickland*, 466 U.S. at 688-89 (1984), courts are entitled to look to objective standards and to the appropriate case law to determine what constitutes "reasonably competent counsel" in a particular death penalty case.    Hence, this Court is entitled to refer to guidelines such as the ABA Standards for Criminal Justice to determine what level of performance is required by reasonably competent counsel in a capital sentencing trial.  As the Supreme Court stated in *Strickland*:

> In cases presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.    Prevailing norms of practice as reflected in the American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 ( 2d ed. 1980) ("The Defense Function"), are the guides to determining what is reasonable....

466 U.S. at 687.

The need to investigate is an essential part of the duty of competent

14

representation and is set forth in the ABA's <u>Standards</u>[3]. Counsel's duty to investigate in preparation for sentencing is even more critical:

> The lawyer has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the Court at sentencing. This cannot effectively be done on the basis of board emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships and the like will be relevant, as will mitigating circumstances surrounding the commission of the offense. Investigation is essential to the fulfillment of these functions.

American Bar Association, <u>Standards for Criminal Justice: The Defense Function, Standard 4-4.1, Commentary</u>, at 4-55 (2d ed. 1980).

This standard applies to a capital sentencing trial because the Constitution requires that a sentencer be provided with and must consider "any aspects of the defendant's background and record" that may be proffer [ed] as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1977). Lower federal appellate courts even prior to the Supreme Court's decision in *Wiggins v. Smith,* routinely gave particular attention to capital cases where little or no mitigating evidence had been

---

[3] It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts consisting guilt or accused's stated desire to plead guilty.

ABA, <u>Standards for Criminal Justice: The Defense Function, Standard 4-4-1</u>, Duty to Investigate, at 4-53 (2d ed. 1980).

presented in support of a life sentence.[4]

Significant for Appellant's case is that portion of *Wiggins* addressing the adequacy of investigation leading up to the critical decision whether to present a mitigation case. As the Supreme Court noted in *Wiggins* when explaining that trial counsel need not pursue every rabbit trail:

> *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. ... We base our conclusion on the much more limited principle ... A decision not to investigate must be directly assessed for reasonableness in all the circumstances

*Wiggins*, 539 U.S. at 2541[internal quotation marks and citations omitted].

In assessing the reasonableness of trial counsel's investigation, the Supreme Court cautioned that two perspectives must be considered by the reviewing court: "[1] not only the quantum of evidence already known to counsel, but also [2] whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. In other words, *Strickland* cannot be read to stand for the proposition

---

[4] See, e.g., *Kubat v. Thieret*, 867 F. 2d 351 (7th Cir. 1989). *Kubat* forecasts the concern, later elaborated in *Wiggins v. Smith*, that trial counsel's failure to investigate or present mitigating evidence during the penalty phase of the trial produces "a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 369. By not presenting mitigating evidence "no effort was made to present Kubat to the jury as a human being." *Id.* at 368.

that a "cursory" investigation will automatically justify any and all decisions that trial counsel subsequently claims to be tactical with respect to sentencing strategy. *Id.* In simple terms, the test becomes: would the facts or allegations known by the reasonable attorney cause him to look further.

O'Brien is not suggesting that limited investigation into mitigating evidence could never constitute reasonable professional judgement in the context of a particular case. Indeed, the Supreme Court recognizes that such choices might be appropriate when counsel determines either that further investigation would be fruitless or that a mitigation case would have been counterproductive. *Wiggins,* 539 U.S. at 536, citing *Strickland* (counsel could reasonably surmise there would be little help from psychological and character evidence), *Burger v. Kemp*, 483 U.S. 776 (1987) (counsel interviewed all witnesses who had been brought to his attention and found much harmful but little helpful information); *Darden v. Wainwright*, 477 U.S. 168 (1986) (decision to present mitigation would have revealed a history of violent crimes and confinement). However, further investigation in O'Brien's case would have been neither counterproductive nor fruitless.

In this case, as in *Wiggins*, the court below did not conduct an assessment of whether the decision to cease investigation when confronted with the red flags replete in the psychological assessment actually demonstrated reasonable professional

17

judgment. Thus this court is entitled to conduct a de novo review, as the Supreme

Court did in *Wiggins*.

### C. Trial Counsel Conducted Limited Investigation of Mitigation Evidence, Ignored Significant Evidence, and Failed to Present a Viable Mitigation Case.

Despite professional norms, counsel abandoned their investigation into

O'Brien's background after considering information from a narrow set of

circumstances. Virtually no, or only cursory, investigation was conducted to find

mitigating evidence for use during the sentencing phase of the trial. This lack of

investigation impacted two potential areas of mitigation evidence: (1) possible mental

health evidence and (2) testimony from family members. Trial counsel's failure to

pursue these obvious avenues of potential mitigation evidence fatally taints counsel's

later "strategy" to present only the most perfunctory of mitigation evidence.

### 1. Mental Health Evidence

As noted by the district court, O'Brien's defense counsel retained two

psychiatrists[5] and a clinical social worker. ROA 371.[6]  Counsel did not receive their

---

[5] Actually, the mental health professionals hired by trial counsel were a clinical psychologist [Gerald Brown] and a psychiatrist [Roy Aruffo]. SF 33 pages 74-77.

[6] "ROA" followed by a page number refers to the record on appeal from the district court; where applicable, the document's tab number precedes the page number or replaces it. "Tr" refers to the transcript of pleadings and documents filed in the state convicting court and is followed by a volume number and then a page number. "SF" refers to the transcribed state court trial proceedings and is followed by volume number and then by page number. "SHT" refers to the transcript of the state habeas proceeding and is followed by page number; no witness

18

reports until the eleventh hour.   In fact, the psychologist's report *still* had not been prepared when counsel was discussing for the record his punishment strategy.   The other expert  reports were generated well *after* voir dire was concluded and after defense counsel would have discussed potential punishment evidence or theories with prospective jurors.   Those reports apparently were ready within a few days of the beginning of testimony.

Trial counsel failed to follow up on the development of the wealth of potential mitigating evidence found throughout those documents.   The timing of the reports may have contributed to the problem: counsel may simply have run out of time to do so.   Nevertheless, those reports raise red flags.   Competent counsel would have pursued these leads, particularly as they pertained to O'Brien's affiliation with and emotional dependence on gangs.

Illustrations of the potential mitigation evidence are contained in Dr. Aruffo's psychiatric evaluation dated April, 1994:

...the following factors are of important psychological significance:

1.    Mother's difficulties with men at the time of O'Brien's birth.
2.    Early failures in establishing a mother-infant bond.
3.    Asthma at an early age.
4.    Attachment to a grandmother who proved to be over indulgent and have difficulties in setting boundaries.

---

testimony was adduced during state habeas proceedings and thus no statement of facts was prepared.

5.     Having been treated harshly, in the formative years, by two jealous men - one married to mother and one married to grandmother.

6.     The adolescent turning away from his family and becoming much too deeply involved in one gang and later one group. He already had an excessive amount of emotional dependence, became a group follower, in a typical adolescent process, became emotionally dependent on the groups and especially the group leader so that his behavior was controlled externally.

SHT 233.

Defense counsel was slow in securing expert reports for potential mitigating evidence. Similarly, counsel did not file a motion for the appointment of an investigator until December 29, 1993, and the court did not rule on the motion until February 21, 1994. Tr I pages 60-61. But counsel cannot have been unaware of the need for investigation – both as to the crime and as to the possible punishment. Among the topics professional norms suggest counsel should consider presenting are medical history [physical and psychological], educational history, employment history, family and social history, prior adult or juvenile correctional experience, and religious and cultural influences. *Wiggins*, 539 U.S. at 524, citing ABA Guildelines. See also, Janet Morrow and Robert Morrow, *In a Narrow Grave: Texas Punishment Law in Capital Murder Cases*, 43 S. TEX. L. REV. 979, 1053-1054 (2002) (listing eleven categories generally used by capital defense counsel as the *starting* point for mitigation research. Moreover, counsel could not have been unaware of the need for timely investigation. The Supreme Court impliedly recognizes that mitigation

development and investigation should occur sooner rather than later. The Court favorably cites ABA commentary discussing counsel's substantial and important role to raise mitigating factors initially to the prosecutor as well as at the punishment hearing. *Wiggins*, 539 U.S. at 524. Here counsel's investigation was still incomplete during the critical period of jury selection, when the role of mitigation was a contested issue.

Had a reasonable investigation been conducted into O'Brien's background, evidence concerning O'Brien's alcohol problem would have come to light before trial. The evidence was clearly discoverable since the prosecution adduced testimony of O'Brien's coming drunk to school as well as his aggressive behavior once there. SF 31 pages 12-16, 121-122. From the State's evidence a pattern emerges of alcohol consumption that accompanies violent behavior: O'Brien was drinking beer just before the crime, O'Brien was drinking beer at the site of the extraneous offense (a purported attempted rape-murder), and O'Brien was drunk when acting as a bully at school. This linkage, while not providing a defense to the capital charge, should have been pursued for its mitigation potential.

Had a reasonable and *timely* investigation been conducted into O'Brien's background before trial, significant evidence concerning how Peter Cantu manipulated O'Brien would have come to light. This manipulation by Peter Cantu would have

been evidence that a jury could evaluate regarding moral blameworthiness. As Joe

Cantu, the state's own witness, testified at trial, he considered O'Brien a puppet of

Peter Cantu.    This view of their relationship is compatible with Dr. Aruffo's

psychological portrait of O'Brien as a group follower whose actions are externally

controlled.    Counsel did not present that explanation to the jury; even more

significantly they presented no evidence to explain how a young man on the brink of

adulthood could act in a manner usually associated with the much younger.

Counsels' concern that introducing psychological evidence would open the door

for adverse prosecution evidence is belied when the evidence actually introduced at

trial is considered. In addition to a litany of acts of aggression and uncharged criminal

conduct, the State's punishment evidence included testimony from a school

psychologist that O'Brien was devoid of organic brain disorder but did have conduct

disorder (SF 32 pages 122, 127-129) and testimony of a psycho-evaluator for the

school district that O'Brien was manipulative.  SF 32 page 144.  The net effect of

counsels' decision was to leave that evidence unchallenged and unexplained.

### 2. Testimony from Family Members

As noted by the district court, and shown by affidavits in the state habeas

proceeding, numerous relatives and friends were available to defense counsel, but

none were called as witnesses.  ROA, pages 369-371.  These potential, uncalled,

witnesses fall into three general categories: (1) the sole potential witness [O'Brien's mother] contacted by counsel, (2) the potential witness [O'Brien's grandfather] identified by the defense team's psychological report but not followed up by counsel, and (3) other available witnesses [family friends] not discovered by counsel.

### a. O'Brien's Mother: Ella Jones

Defense counsel stated to the court that O'Brien told them that he did not want his mother to testify. Further, defense counsel stated that they spoke with O'Brien's mother and after conversations with her, had determined that if they called her to testify, all the evidence that she would provide would be contrary to any defensive issue. In other words, the defense view was that O'Brien's mother's testimony could only be helpful to the State. The district court concluded that this decision, based on counsel's investigation and professional judgment, "was not so patently incorrect as to provide grounds for relief." ROA page 370. This finding is incorrect for four reasons.    First, it is incorrect because the defense "strategy" at punishment was only to show that O'Brien had no disciplinary actions against him while incarcerated. His mother's testimony would not have undermined that position.

Second, it is incorrect because defense counsel could have used Ella Jones' testimony to present the historical context of O'Brien's life, explaining for the jury how he came to substitute the "gang" for family connections. It was O'Brien's

23

involvement with Peter Cantu's group that led to the offense. The trial evidence suggests that O'Brien was a pawn to that group; that view was supported by evidence, not introduced to the jury, that O'Brien was a follower easily controlled by outside forces and that his gang affiliation was a substitute for lack of family structure. The jury, however, knew nothing of that psychological profile or of O'Brien's family life. What the jury did know was that the State called numerous witnesses to detail O'Brien's behavior over multiple years predating the offense, crafting a portrait of a stone-cold gang killer. Defense counsel did nothing to challenge that perception.

Third, it is incorrect because defense counsel could have used Ella Jones' testimony to reveal O'Brien's remorse of the evening of the murders. This was briefly mentioned by Peter Cantu's older brother at the guilt-innocence phase of trial: O'Brien went home and was upset, the others went partying and were bragging about the crime.

Fourth, it is incorrect because defense counsel must exert independent professional judgment and cannot substitute their expertise for the expressed reluctance of their teenage client not to have his mother testify. If the Petitioner's concern for his mother was defense counsels' reason for not using her testimony, this reason does not justify counsels' failures. *Thomas v. Kemp*, 796 F. 2d 1322, 1324 (11th Cir.), cert. denied, 479 U.S. 996 (1986). When a defendant opposes the use of his

24

family members' testimony, the attorney needs to interview the family to determine

the value of their testimony and, *if it is valuable, attempt to convince* the defendant of

the need for their testimony. *Strickland*, 466 U.S. at 688 (the attorney's basic duties

include keeping the defendant informed of important developments and consulting

with him on important decisions and developments). See also, *Mitchell v. Kemp*, 762

F.2d 886, 889 (11th Cir. 1985), cert. denied, 483 U.S. 1026 (1987) (an attorney must

both make an "informed evaluation of potential defenses" and conduct "meaningful

discussion with [the defendant] of the realities of his case").

### b. O'Brien's Grandfather: James Fortson

Defense counsel did not contact O'Brien's grandfather, and no member of the

defense team interviewed him. Defense counsel knew of his existence because their

limited investigation revealed that O'Brien had lived with his grandfather and their

psychiatrist had labeled him abusive and intentionally cruel to O'Brien. SRT pages

235, 254. Fortson's affidavit reveals that he was never contacted by the defense and

was available to testify. SRT page 257. Affidavits from O'Brien's aunt and uncle

reveal that O'Brien was primarily raised by his grandparents; however, defense

counsel did not deem them of significant importance to *contact*.

The district court concludes that because Fortson mistreated O'Brien during

childhood, "the decision not to call Fortson appears to be a reasonable strategic

choice." ROA page 370. That conclusion is incorrect, however, because it is precisely the issue of how O'Brien was treated during his childhood that should have provided the foundation for a meaningful mitigation case.

Where the attorney's decision to forego both investigation and use of the testimony of family members is made without knowledge of what their testimony would be, the decision is neither a strategic or nor a tactical one. *Strickland*, 466 U.S. at 691; *Bouchillon v. Collins*, 907 F. 2d 589, 596-597 (5th Cir. 1990). *Harris v. Reed*, 894 F. 2d 871, 877-879 (7th Cir. 1990); see *Wilson v. Butler*, 813 F.2d 664, 671-672 (5th Cir. 1987), cert. denied, 484 U.S. 1079 (1988). Such failures constitute deficient performance.

### c. Other Witnesses

As the district court correctly summarizes, O'Brien submitted affidavits from his aunt, uncle and two family friends who were never contacted by defense counsel and who could shed light on O'Brien's family dynamic. ROA page 369. The court dismissed the magnitude of this undiscovered and unused evidence for three reasons. First, O'Brien did not identify these potential witnesses for defense counsel. Second, defense counsel did interview "several" family members and concluded they would not be helpful witnesses. And third, O'Brien points to nothing contradicting those assertions or undermining the validity of counsels' strategic choices. ROA page 369.

26

The district court is incorrect and has misapplied the rule of *Strickland* and *Wiggins*.

Concerning the assertion that O'Brien did not identify potential witnesses, counsel observed that "most of O'Brien's friends were codefendants." ROA page 369. That assertion does nothing to address the gravamen of O'Brien's claim of ineffective assistance. Naturally an 18-year old criminal defendant who has bonded with a gang would point to his fellow gang members as his primary support group. That is precisely why counsel has an *independent* duty to investigate.

Concerning the assertion that counsel contacted "several" family members and concluded their testimony would not be helpful, counsels' claim fails for the same reason that it was inadequate as it pertains to their decision not to use O'Brien's mother and to their decision not even to interview O'Brien's primary caregivers as he was growing up. It was not sound strategy to limit investigation into their client's past, and it was not sound strategy to decide not to present their youthful, troubled client as anything other a person able to function in jail.

Since O'Brien's trial counsel failed to personally interview family members or conduct any other meaningful investigation into O'Brien's background, the trial counsels' decision to abdicate the punishment phase of the trial to the State cannot be considered a "tactical" one. "An attorney's trial decisions must be based on a proper exercise of judgment based on adequate knowledge of the facts and relevant law."

*United States v. Cronic*, 839 F. 2d 1401, 1404 (10th Cir. 1988); see also *McDougall v. Dixon*, 921 F. 2d 518, 537 (4th Cir. 1991) (a strategic choice by counsel is one, "... made with full knowledge of the facts and the law, and the options available to him"); *Kimmelmann v. Morrison*, 477 U.S. 365, 385 (1986) (counsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary); *Baxter v. Thomas*, 45 F. 2d 1501 (11th Cir. 1995) (an attorney's decision to limit mitigation investigation must flow from an informed judgment.)

Any deference that courts must afford trial counsel under *Strickland,* in judging whether such failures were constitutionally deficient, as opposed to "tactical" or "strategic" trial decisions, presupposes that an attorney's trial decisions are fully informed and reasonable exercises of professional judgment. "Judges wisely defer to true tactical choices - that is to say, to choices between alternatives that each have the potential for both benefit and loss." *Profitt v. Waldren*, 831 F. 2d 1245, 1249 (5th Cir. 1987). Moreover, "[t]his measure or deference...must not be watered down into a disguised form of acquiescence." *Bouchillon v. Collins*, 907 F. 2d 589, 595 (5th Cir. 1990) (quoting *Profitt*, 831 F.2d at 1248).

The performance of counsel in a capital case requires that counsel undertake an independent investigation to unearth any potential mitigating circumstances or

28

mitigating evidence that may be offered during the sentencing trial. This objective

standard may be established by either national performance guidelines such as the

ABA Standards for Criminal Justice or by reference to relevant case law. *Wiggins v.*

*Smith.*    Based upon either standard, trial counsels' performance in the sentencing

phase of O'Brien's trial fell below that of   "reasonably competent attorneys"

defending a capital case during the penalty phase.  Counsels' decision to forgo a

meaningful investigation and use of the potential mitigation testimony or evidence

was made without the full knowledge of what that testimony or evidence would be.

This decision was, therefore, not a strategic or tactical decision nor was it reasonable.

> **D.    Prejudice is Established under the Facts of this Case Because the Jury was Given no Available Mitigation Evidence of any Weight to Balance Against the Strong Future Dangerousness Evidence Provided by the State.**

As a constitutional matter, the punishment phase of the capital trial in Texas is

a full-blown trial in and of itself and therefore entitled to the same due process rights,

including the right to effective assistance of counsel, as the guilt-innocence phase of

the trial. *See, e.g., Barclay v. Florida*, 463 U.S. 939, 952-954 (1983); *Bullingtin v.*

*Missouri,* 451 U.S. 430 (1981). "A capital sentencing proceeding...is sufficiently like

a trial in its adversarial format and in the existence of standards for decision...that

counsel's role in the proceeding is comparable to counsel's role at trial - to ensure that

the adversarial testing process works to produce a just result under the standards

governing    decision.    For    purposes    of    describing    counsel's    duties,
therefore...[a]...capital sentencing proceeding need not be distinguished from an
ordinary trial." *Strickland*, 466 U.S. at 684.

Failure to present mitigating evidence does not per se demonstrate ineffective
assistance of counsel. *Rector v. Johnson,* 120 F.2d 551 (5th Cir. 1997). O'Brien is not
making such a claim here. If counsels' omissions were based on well informed,
strategic decisions, then they are 'well within the range of practical choices not to be
second-guessed.'" *Id.* quoting, *Wilkerson v. Collins,* 950 F.2d 1054, 1065 (5th Cir.
1992), cert. denied, 509 U.S. 921 (1993).

The analytical framework for assessing prejudice premised on a claim that
counsel failed to pursue and present an available mitigation case involves reweighing
the evidence in aggravation against the totality of available mitigating evidence.
*Wiggins*, 539 U.S. at 534. O'Brien satisfies that burden.

### 1. State's Aggravation Evidence

The State's aggravating evidence at punishment can be conceptually divided
into four major categories: (1) charged offense (2)  misconduct and demeanor at
school, including psychological evidence (3) extraneous offenses and uncharged acts
and (4) gang-related. The evidence in each category was voluminous.

Concerning the charged offense, in addition to the heinous nature of the crime

and injuries suffered by the two victims, the State focused on O'Brien's lack of remorse and his early denials of involvement to a cell mate.

Concerning misconduct and demeanor at school, the State introduced testimony from numerous witnesses: teachers, security guards, bus driver, and classmates. By fifth grade, O'Brien was sent to alternative school because of behavioral problems. Once there, he had to be restrained three to four times a day. He was considered a bully and a fighter, having struck one teacher with a piece of wood and having broken the jaw of a classmate. He set fire to school property and apparently was often drunk at school. He was seen carrying a knife and gun to school, and fondled or assaulted fellow students. Psychological evidence from school records showed O'Brien to be manipulative and suffering from conduct disorder.

Evidence of extraneous offenses was voluminous, with the most damaging being testimony from a co-defendant's brother that O'Brien confessed to another capital offense [an attempted rape, followed by murder, also committed in park]. Additionally, O'Brien's fingerprints were found on a beer can at the scene [although this was a common area for gangs to discard stolen cars]. Other extraneous offense testimony from law enforcement witnesses, fellow classmates and family of fellow gang members involved assaults, numerous car thefts and shoplifting.

Concerning gang activity, the State offered evidence of a police "gang" expert

31

as well as testimony concerning numerous car thefts and O'Brien's role as a knife-carrying "protector" of the gang.

During final argument the State repeatedly hammered on the theme of logical inferences to be drawn from the defense's failure to present any mitigation other than a records clerk. The prosecutor asked specifically where O'Brien's mother and family members were: "Would you call his mother if she could say something good? Wouldn't you call his uncle, a neighbor?" SF 34 pages 88-89. Similar speculation occurred for absent psychological evidence. The State's conclusion was that no one was called because "there isn't anybody" who could help O'Brien's case. Id.

### 2. Available Mitigation Evidence

Possible mitigation evidence that could have been presented can be conceptualized as falling into four major areas: (1) O'Brien's abusive childhood (2) O'Brien's mental health problems (3) the function of a gang as substitute for family and (4) O'Brien's remorse. Standing alone, or considered together, each has a profound potential impact for changing the outcome of the punishment verdict.

Concerning O'Brien's abusive childhood and resulting behavior problems, even the State's evidence reflects a child that by *fifth* grade had to be physically restrained throughout the day, a child largely unsupervised who was drunk by the time he got on the school bus in the morning. No child makes those choices. Exploration of the facts

32

surrounding O'Brien's life up to that point would have pinpointed the reasons explaining the *why* behind such acts.    While not excusing the offense, an understanding of the devastating role of child abuse on the formation of the adult might have impacted the jury on the question of the appropriateness of a life sentence.

Concerning O'Brien's mental health problems, there was undisclosed evidence that his behavior was externally controlled, making him as easy pawn for a controlling gang leader such as Peter Cantu. Even a cursory reading of his school records reveals a troubled child who was largely warehoused by the system until he was old enough to pass through it. Evidence of alcohol abuse is shown from O'Brien's pre-teen period; it carried over to the time of the offense. It is also present as an aside in witness descriptions of extraneous offenses. An expert in substance abuse could have shown why a young child becomes chemically dependent, how "voluntary" ingestion of alcohol impacts impulse control, and what impact intervention and treatment might be expected to have on future behavior. The expert also could have explained the role that alcohol played in the offense. These last two factors are critically important when the jury is considering future dangerousness: if O'Brien is in a structured prison environment, where he is not drinking, will he be a future danger.

Concerning gang affiliation, there is ample literature suggesting that children are active in gangs at ages 17-18, that almost 90% of all gang members are African

33

American or Hispanic, and that the reasons for joining gangs included low self esteem, difficulties in the child's personal life, academic failure and family disorganization. See H. Mitchell Caldwell and Daryl Fisher-Ogden, *Stalking the Jets and the Sharks: Exploring the Constitutionality of the Gang Death Penalty Enhancer*, 12 GEO. MASON L. REV. 601, 622, footnotes 122, 125, 133 (2004). Violence internal to the gang helps intensify the bonds among members. *Stalking the Jets*, at 629. Developing evidence of the function of gang membership for someone with O'Brien's past and resulting psychological profile would have provided context for three critical punishment points. First, it would re-enforce the random, albeit tragic, nature of the crime. The gang was conducting an internal "initiation", a show of violence between the members and hopeful new member that serves to strengthen bonds within the group. The alcohol consumption, coupled with the heightened adrenaline produced by the "gauntlet" fighting, was the fuel the sparked the crime as the two young women passed through the darkened park at midnight. Second, it would show the logical connection between O'Brien's abusive childhood and his later decision to join a gang, an association in which he was not in a leadership role and hence easily manipulated by more dominant personalities. Third, it could provide the foundation for explaining why O'Brien appeared to function well in a prison-like environment while awaiting trial. This would assist the jury in determining if there was reason to assume that

34

O'Brien would not be a future danger to fellow inmates were he to receive a life sentence.

Concerning remorse, there was testimony from Peter Cantu's brother than O'Brien was the only gang member to have gone home after the crime and to have expressed his remorse that night. In contrast, the other gang members continued their party and bragged about the crime and their prowess. An expert in "gang" dynamics could have explained the very different reactions of O'Brien and his confederates, an issue relevant to mitigation. A psychologist could help the jury understand why a young man might express remorse to his leader's brother but later assume an unconcerned role when talking with those outside his circle.

Counsel cannot excuse their failure to pursue clear leads in their limited investigation merely by relying on the conclusion of their psychologist that were his testimony to be elicited, his results would be

> available for scrutiny and use by the prosecution. Consequently, the negative aspects of his personality profile and the problem behaviors he has exhibited for many years, together with his generally antisocial orientation, will likely be revealed to them and will consequently be elicited in court testimony.

SHT page 228. The reality is that all negative aspects of O'Brien's personality profile and behavior problems *were* introduced before the jury. Unfortunately, the reality is also that corresponding mitigation evidence was not.

The ineffectiveness of his counsel denied O'Brien of well established substantive rights under the Sixth, Eighth and Fourteenth Amendments. A capital defendant has the right to present evidence in mitigation of a death sentence. Moreover, the jury must be afforded the ability to consider and give effect to, any relevant mitigating evidence proffered by a defendant as a basis for a sentence less than death. *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Skipper v. South Carolina*, 476 U.S. 1 (1986). The relevant inquiry in determining prejudice is, "whether there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Fretwell*, 113 S. Ct. at 845.

Because a single juror, holding out for a life sentence during the punishment phase deliberations, would have resulted in the assessment of a life sentence, (*see* Tex. Code Crim. Pro. Art. 37.071§ 2(g), (i)), this Court's "prejudice" analysis regarding errors in the sentencing phase must ask only whether there is a reasonable probability that a single juror's mind could have been changed had counsel performed effectively. As the Supreme Court emphasized in *Wiggins*, had the jury been able to place the defendant's excruciating life on the mitigation side of the balancing scale, there is a reasonable possibility that at least one juror would have struck a different balance. *Wiggins*, 539 U.S. at 537.

36

Courts have long considered evidence, such as was available here, of troubled

family history, emotional disturbance, defendant's background, character, mental

illness, and childhood abuse to be types of mitigating evidence that juries should be

allowed to hear. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Eddings, v. Oklahoma*,

455 U.S. 104, 113-114 (1982); *Franklin v. Lynaugh*, 487 U.S. 164, 108 S. Ct. 2320

(1988); *Skipper v. South Carolina*, 476 U.S. 1 (1986).

In O'Brien's case evidence of this type was not only available to counsel, but

could have also been discovered through investigation by trial counsel and presented

during the penalty phase of the trial. As a result, O'Brien was deprived of his

constitutional right to counsel due to the utter abandonment of his cause by his trial

counsel. "That a person who happens to be a lawyer is present at trial alongside the

accused, however, is not enough to satisfy the constitutional command." *Strickland*,

466 U.S. 685.

## II. O'BRIEN WAS DEPRIVED OF A JURY DETERMINATION OF PUNISHMENT THAT DID NOT REQUIRE A NEXUS BETWEEN MITIGATION AND THE CHARGED OFFENSE.

The State of Texas deprived O'Brien of a fair trial when it allowed the

prosecutor to "qualify" the jury on the theory that mitigation evidence in the context

of a capital murder punishment hearing required a connection to the crime charged.

Trial prosecutor used a theme of nexus beginning with jury selection, and the harm

was compounded throughout trial, culminating in final argument. This action violates

clear Eighth Amendment jurisprudence. *Tennard v. Dretke*, 124 S.Ct. 2562 (2004).

The district court incorrectly characterized O'Brien's claim as one challenging the

giving of a mitigation charge, and hence denied relief. ROA page 359. In fact, the

crux of O'Brien's challenge is that while the proper statutory charge was given, its

effect was negated by deliberate, constant limitations imposed by the prosecutor and

sanctioned by the trial court.

### A. Throughout Trial the Prosecution Sought to Restrict Consideration of Mitigation Evidence, By Stressing that it Must Be Connected to the Crime.

Beginning with jury selection and continuing through witness examination and

final argument, the prosecution continually stressed to the jury that mitigation

evidence must be linked to the rape-murders in order to be relevant.

### 1. Voir Dire Examination

During the voir dire examination by the state, the prosecutor told serving

juror  Charles Phillip Gould that there must be a nexus between the mitigating

evidence and the crime, as demonstrated in the following exchange:

> PROSECUTOR:  And you might consider whether or not those things in his background or in the case background are connected to the actual killing.
>
> For example, if there's something in a defendant's background that you didn't think was even connected to why he did what he did, then

38

you might consider that as not sufficiently mitigating; but if you thought it was consistent or it was connected, then you might consider it as being mitigating. Do you understand that?

VENIREPERSON: Yes, sir.

PROSECUTOR: For example, it might be something in the background that had nothing to do with why a person killed somebody or it might be something in his background that says, like severe physical or sexual abuse, that his mind was in such a state that it might be connected to why he treated somebody the way he did and killed somebody. Can you see that?

VENIREPERSON: Yes.

SF 8 pages 154-155.

The prosecutor informed the following jurors during voir dire of essentially the same thing: that the only mitigation evidence was evidence that connects to the crime itself and that would mitigate or lessen O'Brien's degree of guilt: Richard T. McGovern (SF 9 page 28); Clifton Brocket (SF 9 page 105).[7]

<u>Special Issue No. 3</u>, in the charge, reads as follows:

Taking into consideration all of the evidence, including the

─────────────

[7] This was a consistent prosecutorial theme during jury selection, as demonstrated by the voir dire of the following venire members: Bobby Jean Dull (SF 10 page 62), Ms. S.A. Calhoun (SF 10 page 87), Jay Dean Ohrt (SF 10 page124), Jacqueline Lemoine (SF 11 page32), Van Thanh Nguyen, (SF 11 page 75), Mel Cantu (SF 13 page 44), William Erb (SF 13 page 55), Richard Shelly (SF 13 page 208), Ella Blount (SF 13 page 245), Robert Powell (SF 14 page137), Larry Sullenger (SF 14 page 225), Pedro Feliz (SF 18 page 62), Lori Harrison (SF 18 page122), Robert King, Jr. (SF 19 page 25), Buford Jakes (SF 19 page 29), Charles Nunes (SF 19 page182), Claude Brister (SF.20 page 29), Nanjala Jackson, (SF 20 page 64), Melissa Duran (SF 20 page104), Patricia Lund (SF 20 pages174-175), Lupita Power (SF 20 page 260), Charles Crittendon (SF 20 page 245), Joe Tom Walls (SF 21 page 361).

circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than death be imposed? You are instructed that the term "mitigating evidence" or mitigating circumstances" means evidence that a juror might regard as reducing the defendant's moral blameworthiness.

TR I page 765.

### 2.    Direct Examination at Punishment

One of the State's punishment witnesses, a school psychologist, testified that O'Brien was learning disabled in mathematics. The prosecutor asked what connection that disability had to the crime and whether it could be connected to the crime as an "excuse". SF 34 page 25.

### 3.    Final Argument

During closing argument at punishment, the prosecutor revisited the now familiar refrain that a nexus of mitigation to the crime was required:

> Then you move on to Question No. 3, then you look at the Charge. And it tells you to ask yourself if there's anything mitigating. And we talked about what does mitigating mean ...
>
> What, if anything, is mitigating about him that you heard? The only thing that I can possibly think of is that the guy's learning disabled in arithmetic, he can't add.
>
> ... Well, does that have anything to do with raping and killing these two girls? Can that possibly somehow be connected as an excuse for what he's done to them?

40

He told you no. You didn't need a psychiatrist or psychologist to tell you that. It doesn't take a rocket scientist to figure out if you can't add that doesn't give you the right to go out and kill ... other people. So there's not anything at all that you heard from any witness that is mitigating.

SF 34 pages 24-25.

**B.      Age and Institutional Good Behavior Were Mitigating Evidence Presented at Punishment and Not Connected to Offense.**

O'Brien's case presents two distinct types of mitigation evidence not specifically connected to the crime: his youth and his lack of violence in a structured facility. The jury was unable to give effect to that evidence. Beginning with voir dire, the jury was selectively educated to the concept that mitigation must be connected to the crime to be legally relevant.

The United States Supreme Court emphatically held in *Lockett v. Ohio,* 438 U.S. 586 (1978) that a State may not preclude a jury from considering relevant mitigating evidence.  The Texas Court of Criminal Appeals has consistently misinterpreted decisions requiring that the jury be given a mechanism to fully consider and give effect to all mitigating evidence. See *Penry v. Lynaugh*, 492 U.S. 302 (1989); *Penry v. Johnson*, 532 U.S. 782 (2001) [*Penry II*]. In this case, the evidence showed that O'Brien exhibited no actual violent behavior while in a structured environment. Although this mitigating evidence may not have been linked to the offense, he was entitled to have the jury consider all evidence proffered in mitigation in determining

41

his sentence. *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

The Eighth and Fourteenth Amendments require that a sentencing jury consider as mitigating evidence "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). In accordance with this requirement, the Court recognized that evidence of post-arrest good behavior are constitutionally relevant mitigating evidence. See *Skipper v. South Carolina*, 476 U.S. 1, 7 (1986) ("a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination"); see also *Franklin v. Lynaugh*, 487 U.S. 164, 177 (1988) (plurality) (defendant's "good disciplinary record during his period of incarceration, both before and after the murder" is relevant mitigating circumstance).

O'Brien additionally is entitled to relief based on the "nexus" requirement that had been engrafted on mitigation charge jurisprudence by Texas courts, but which is contrary to the repeated holdings of the United States Supreme Court. That requirement operated to preclude consideration either of his youth or his good jail house behavior in mitigation of a sentence of death.

A "nexus" requirement is inconsistent with the Supreme Court's most recent

42

statement on the issue. *Tennard v. Dretke*, 124 S.Ct. 2562(2004); see also, *Williams v. Taylor*, 529 U.S. 362, 398 (2000) ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.").

The Supreme Court has long recognized that youth can be a mitigating factor. *Eddings v. Oklahoma*, 455 U.S. 104 (1982). That recognition assumes special relevance in light the recent decision of the United States Supreme Court holding unconstitutional imposition of the death penalty as punishment for a crime committed when below the age of 18. *Roper v. Simmons*, 125 S.Ct. 1183 (2005). However, jurors in Petitioner's case were unable to give effect to his youth as mitigating evidence in light of the jury instructions given at punishment.

## III. O'BRIEN WAS HARMED BY INTRODUCTION OF EVIDENCE OF GANG MEMBERSHIP AS AN AGGRAVATING PUNISHMENT FACTOR.

O'Brien was denied a fair hearing during the punishment phase of the trial when evidence was presented which violated his First Amendment and Fourteenth Amendment right to freedom of association. The district court concluded that O'Brien's case fell in a somewhat gray area but further concluded that any error in admitting the testimony was harmless. ROA 356. O'Brien agrees with the characterization of the legal merits of his claim, but submits that the district court

erred in assessing harm.

During the punishment stage of the trial, the prosecution called a Houston police officer assigned to the Westside Gang Unit to testify about the gang significance of O'Brien's tattoos. SF 33, page 37. He discussed ten photographs of O'Brien, describing the tattoo in each photograph and telling the jury what he believed each tattoo to mean in gang parlance. In the officer's opinion, O'Brien's tattoos of a skull head and many other tattoos had no significance whereas the Star of David tattoo was a major symbol of the "Folk Nation" gang. SF 33, pages 44-46.

The officer testified about more than gang signs or insignia. Significantly, he testified that gangs "must be" involved in crime in your experience. He shared his belief [based solely on the tattoo] that O'Brien was a member of the "Folk Nation" gang. He further testified that the "Folk Nation" espoused promoting the black race and that it was involved in criminal activity. SF 33, pages 53, 55.

The Supreme Court has held that the First Amendment protects an individual's right to join groups and associate with others holding similar beliefs. *Dawson v. Delaware,* 503 U.S. 159 (1992); see also *Aptheker v. Secretary of State,* 378 U.S. 500, 507 (1964); *NAACP v. Alabama ex. Rel. Patterson*, 357 U.S. 449, 460 (1958). The First Amendment prevents the state from employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the

issue being tried. *Dawson v. Delaware,* 503 U.S. 159 (1992).[8]

*Dawson* rejected the proposition that the state could bring forth evidence in the punishment stage of a capital murder trial regarding a defendant's association with a particular gang in an attempt to prove the defendant would be a future danger to society, unless it was proven that the group or association endorsed or was involved in any unlawful or violent acts. 503 U.S. at 165.

This Court has held that the Constitution is not offended when the State using a defendant's association with a prison gang as evidence of future dangerousness. *Fuller v. Johnson,* 114 F.3d 491 (5th Cir. 1997). *Fuller* is distinguishable from *Dawson* because in *Fuller* the jury heard testimony that the gang routinely engaged in significant criminal activity of a violent nature. *Fuller,* 114 F.3d at 497. O'Brien's case more closely resembles *Dawson* in that here there was no evidence that the gang was involved in *violent* criminal activity.

It is clear from the testimony elicited from Officer Knox that he linked O'Brien to the "Folk Nation" by O'Brien's Star of David tattoo. The prosecution never elicited from the witness that the "Folk Nation" was involved in any manner with the crime for which O'Brien was convicted nor did they bring forth evidence that "Folk Nation"

---

[8]  "The question presented in this case is whether the First and Fourteenth Amendments prohibit the introduction in a capital sentencing proceeding of the fact that the defendant was a member of an organization called the Aryan Brotherhood, where the evidence has no relevance to the issues being decided in the proceeding. We hold that they do." *Dawson,* 503 U.S. at 160.

was advocating racial intolerance or subversive advocacy where such evidence was relevant to the issues in the case. The only reason that this evidence was introduced was to associate O'Brien with "Folk Nation" then invite the jury to draw adverse inferences from uncorroborated testimony that "Folk Nation" espoused promoting the black race and "Folk Nations" are involved in criminal activity.

O'Brien's First and Fourteenth Amendment rights to freedom of association were violated because the prosecution did not prove that the "Folk Nation" had either committed or endorsed violent unlawful acts. Given that state of the record, "Folk Nation" evidence relevant was not relevant to help prove future dangerousness, or any other relevant element at the punishment stage of the trial, or to respond to the scanty mitigating evidence presented by the defense.

The district court's determination that even if erroneously admitted, error was harmless is premised on two factors. First, O'Brien's long history of criminality and violence. Second, his utter lack of remorse. ROA page 356. However, as shown earlier, the jury was deprived of relevant mitigating evidence and there was, in fact, evidence of O'Brien's remorse beginning on the night of the crime.

In that the First and Fourteenth Amendments prohibit the introduction in a capital sentencing proceeding a defendant's membership in an organization, when that evidence has no relevance to the issues being decided in the proceeding, O'Brien is

46

entitled to habeas relief.

## IV.    O'BRIEN WAS CONSTITUTIONALLY ENTITLED TO INFORM THE JURY OF THE ACTUAL MEANING OF A LIFE SENTENCE.

Immediately before commencement of voir dire, defense counsel asked permission of the trial court to voir dire the jury on the minimum time a convicted capital murderer would have to serve in the Institutional Division of the Texas Department of Criminal Justice, if assessed a life sentence, before he would become eligible for parole consideration. The trial court denied the request. SF 2, page 13.

Similarly, the trial judge refused O'Brien's request that the jury be instructed concerning the mandatory 35 year period a convicted capital murderer serving a life sentence would have to serve before parole eligibility applied. Defense counsel specifically requested that the court's instructions at punishment include a charge

> on the parole law as it pertains to the capital murder law and that is, that is capital murder, life imprisonment, and that is the sentence, the minium parole consideration would be after the defendant has served thirty-five years, and the jury just be charged in this manner. And if you decide so, we request permission to argue to the jury that there is a thirty-five year minimum in the State of Texas for this particular offense at the time it occurred for life imprisonment.

SF 33, pages 267-268.

The court both denied the requested charge and denied a request to allow defense counsel to argue a correct statement of Texas parole law. SF 33, page 268.

At the time of O'Brien's conviction, a defendant convicted of capital murder

47

who received a life sentence was ineligible for parole until he had served 35 years in prison. Tex. Code Crim. Proc. art. 42.18 §8(b). Thereafter, the time required to be served prior to parole eligibility for offenses committed after September 1, 1993, was increased to 40 years. Tex. Gov't Code Sec. 508.145. Still later, Texas law was amended for offenses committed after September 1, 1999, to provide for the following charge on parole law at the capital murder defendant's request:

> Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

Tex. Code Crim. Proc., art. 37.071 §2(e)(2) (Vernon Supp. 2000).

The Texas Legislature has currently passed an amendment to the Texas Code of Criminal Procedure formally creating life without parole, and conforming the statute to the reality of its application. See Senate Bill 60, passed favorably from the Senate on April 14, 2005 and favorably from the House Committee on April 20, 2005; http:www.capitol.state.tx.us/cgi-bin.

48

A. ***Simmons* Applies to Texas Death Penalty Practice and Under the Facts of O'Brien's Case.**

O'Brien was deprived of due process and equal protection by the trial court's failure to inform the jury that if sentenced to "life", O'Brien would not be parole eligible until he had served 35 calendar years. The district court erred in concluding both that *Simmons v. South Carolina* is inapplicable and that were *Simmons* to apply in theory, consideration would be barred under classic notions of retroactivity. *Simmons v. South Carolina*, 512 U.S. 154 (1994). ROA page 362-363.

The District Court denied relief in part on the basis that the decision of the Supreme Court in *Simmons v. South Carolina* is inapplicable to states such as Texas because life without parole is not a sentencing alternative. In truth, there have been numerous Fifth Circuit cases rejecting habeas *Simmons*-based claims on the theory that the defendant would eligible for parole regardless of the amount of time that inmate must serve prior to becoming parole eligible. See, e.g., *Elizalde v. Dretke*, 362 F.3d 323 (5th Cir. 2004).

O'Brien acknowledges, as the district court correctly observed, that since its decision in *Simmons*, the Supreme Court has reiterated that the doctrine applies to those state sentencing schemes where life without parole is a punishment option. *Ramdass v. Angelone*, 530 U.S. 156 (2000). This Court interprets *Simmons* as finding

49

a parole instruction constitutionally warranted only when: (1) the state argues that the defendant represents a future danger to society; and (2) the defendant is legally ineligible for parole. See, *Jones v. Dretke*, 375 F.3d 352 (5th Cir. 2004).

The capital offense serving as the basis of O'Brien's conviction occurred in June 1993. Thus it would seem on the surface that because O'Brien would have been parole-eligible if the jury had sentenced him to life in prison, he enjoyed no constitutional right to have the jury in his case instructed on Texas parole law. That conclusion, however, is flawed.

As applied, Texas is a life without parole state for the convicted capital murder defendant who receives a life sentence. Thus, it joins the 26 states that have a statutory life-without-parole alternative to death. Technically, of course, Texas merely had a 35-year rule for capital murder defendants sentenced to "life".[9] However, the reality of the Texas death penalty scheme is that, as publicly acknowledged by the previous Director of the Texas Department of Criminal Justice Institutional Division's Classification and Records Division, "Of course we have life

---

[9] Under the Texas statutory scheme, a "life" sentence will be imposed as the result of one of three possible scenarios. First, the State is seeking the death penalty and the jury answers the special issues in a way that results in life instead of death. Second, the State is seeking the death penalty and the jury is unable to answer one of the special issues, resulting in the immediate mandatory imposition of a life sentence. Three, the State tries the case as capital murder but does not seek the death penalty, in which event a guilty verdict triggers an automatic life sentence. Tex. Code Crim. Proc. art. 37.071 Sec. 1, Sec. 2(g).

without parole, it just doesn't say so in so many words."[10]

Moreover, the due process guarantee of fundamental fairness compels a reading of *Simmons* that answers the reality of the Texas application. The significant protections of *Simmons* are premised on an understanding of the ethos of the American people: we are willing to make hard choices when fully informed; to ask us to do so when we are not is unjust. A state should not be able to excuse itself from the strictures of *Simmons* by the technicality of a statutory model which seems exempt on its face when the reality and application in that state is squarely within the sphere of *Simmons* concern.

O'Brien's case meets the first "prong" of *Simmons* in that future dangerousness was a major portion of the State's theory at the punishment phase of trial.    To determine if future dangerousness is at issue in a case, the reviewing court should ask whether the defendant's future dangerousness was a logical inference from the evidence, or whether it was injected into the case through the State's closing argument. *Kelly v. South Carolina*, 534 U.S. 246, 252 (2002).  Both aspects are present in O'Brien's case. As detailed in O'Brien's challenge to defense counsel's

---

[10] Janet Morrow and Robert Morrow, *In a Narrow Grave: Texas Punishment Law in Capital Murder Cases*, 43 S. TEX. L. REV. 979, 1073 (2002).  The authors relayed a conversation with Mr. S.O. Woods concerning his testimony in a state habeas hearing in 2000. Mr. Woods made this observation during discussions of the parole board's power to keep inmates doing stacked time in prison for life. As the authors note, trial level prosecutors have shared similar sentiments with members of the press. *Id.*, at 1073, footnote 429.

failure to pursue and present mitigation evidence, during the punishment phase of trial, the State of Texas sought to establish O'Brien's future dangerousness by introducing evidence of extraneous crimes, gang membership and school discipline. The issue of future dangerousness was clearly joined at trial.

**B.**     ***Teague* Does Not Bar Application of *Simmons* in this Case.**

The decision in *Simmons* was clearly established law when Appellant's conviction became final on direct appeal in 1997. Thus, application of the *Simmons* holding and rationale does not implicate *Teague*. See, *Penry v. Lynaugh*, 492 U.S. 302, 314-315 (1989) (under *Teague*, a habeas petitioner is "entitled to the benefit of those decisions" pre-dating the conclusion of his direct appeal.)

Similarly, the several post-*Simmons* decisions of the Supreme Court are applicable here. Any claim by the Director to the contrary is reminiscent of the failing government claim in *Wiggins v. Smith*, 539 U.S. 510 (2003). There the government argued, in the context of a claim of ineffective assistance for failure to investigate mitigation punishment evidence, that *Williams v. Taylor*, 529 U.S. 362 (2000) could not aid the defendant since *Williams* post-dated the state court decision. The Supreme Court rejected that argument, holding that *Williams* controlled because it was merely an "application of " *Strickland v. Washington* which was "clearly established" at the time of the *Wiggins* state court decision.

## CONCLUSION

This Court should find that (1) O'Brien was denied effective assistance of counsel at the punishment phase of his capital trial (2) the jury was improperly restricted in its ability to give mitigation effect to his youth and institutional good behavior (3) O'Brien was harmed when evidence of purported gang membership was introduced on the issue of future dangerous without a showing that the gang engaged in violent criminal activity, and (4) O'Brien was denied his constitutionally protected right to advise the jury of the meaning of a life sentence. As a result of those finding this Court should grant relief on any or all of the four grounds argued in this Brief.

Respectfully submitted,

Catherine Greene Burnett
Member, Fifth Circuit Bar
Texas Bar No.  08390900
1303 San Jacinto
Houston, Texas 77002
(713) 646-1831
(713) 646-1744 [fax]
Counsel of Record

53

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of May, 2005, a true and correct copy of the foregoing pleading was served, in both paper and electronic formats, upon opposing counsel by depositing the same in United States Mail, first class, postage prepaid, addressed to:

> Attorney General for the State of Texas
> ATTN: Ms. Tina J. Dettmar
>     Assistant Attorney General
> Capital Litigation Division
> P.O. Box 12548, Capitol Station
> Austin, Texas  78711-2548

Catherine Greene Burnett

54

CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5th Cir. R. 32.2.7(b).

1.     EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5th Cir. R. 32.2.7(b)(3), THE PRINCIPAL BRIEF CONTAINS (INCLUDING FOOTNOTE COUNT) select one:

     A.   13,252 words

2. THE BRIEF HAS BEEN PREPARED (select one):

     A.  in proportionally spaced typeface using:

          WordPerfect 9.0 for Microsoft Windows XP Home Edition; with 14-point proportionally-spaced Times New Roman font in the text, and 12-point proportionally-spaced Times New Roman font in the footnotes.

3. THE UNDERSIGNED HAS PROVIDED AN ELECTRONIC VERSION OF THE BRIEF AND/OR A COPY OF THE WORD OR LINE PRINTOUT.

4.     THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN 5th Cir. R. 32.2.7, MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

*Catherine Greene Burnett*
Catherine Greene Burnett